UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-06-63-B-W |
| | ) | |
| JOSEPH BELSKIS, | ) | |
| | ) | |
| Defendant. | ) | |

## SENTENCING ORDER

The Court concludes that post-*Cunningham*[1] it retains the authority to make factual findings under the more probable than not standard to determine the applicability of Guideline provisions.  After an evidentiary hearing, the Court includes as relevant conduct in the calculation of drug quantity the amount from a negotiated, but unconsummated sale and some, but not all, amounts from contemporaneous daily sales.  Finally, because the Defendant threatened both a confidential witness and a DEA agent, and thereby halted an ongoing investigation, the Court enhances his sentence for obstruction of justice and declines to grant him a reduction for acceptance of responsibility.

## I. STATEMENT OF FACTS

Indicted on October 4, 2006 on two counts of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1), Joseph Belskis pleaded guilty to both counts on November 8, 2006.  *Minute Entry* (Docket # 24).  At the Rule 11 Hearing, Mr. Belskis admitted facts in the Government's Version of the Offense, which described two cocaine sales:  one on June 14, 2006 for one ounce for $1,600.00, and the other on June 29, 2006 for two ounces for $2,800.00, a total of 85.05 grams.

---

[1] *Cunningham v. California*, __U.S.__, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007).

In its Presentence Investigation Report (PSR), the United States Probation Office (USPO) calculated drug quantity under the Guidelines by beginning with the three ounces of cocaine Mr. Belskis admitted and adding two calculations as relevant conduct under U.S.S.G. § 1B1.3:  (1) a sale that Mr. Belskis promised to make before he was arrested; and, (2) an estimate of the amount of cocaine Mr. Belskis sold during the fifteen day interval between June 14, 2006 and June 29, 2006, based on what Mr. Belskis said he generally sold on a daily basis.  The inclusion of the future sale adds 4 ounces (113.40 grams) to drug quantity and the inclusion of the daily sales – of a quarter ounce per day (7.09 grams) for fifteen days – adds (106.35 grams) to drug quantity.  The total drug quantity attributable to Mr. Belskis under the PSR is 304.80 grams.[2]

The calculation of drug quantity  and the imposition of a two-level enhancement for obstruction of justice have a significant impact on Mr. Belskis's guideline range of sentence.  If the drug quantity is limited to what Mr. Belskis admitted during the Rule 11 Hearing, the base offense level would be level 16; if only the future sale is added, the base offense level would increase to 18; however, if the drug quantity includes both the future sale and cumulative daily sales, the base offense level rises to 22.   U.S.S.G. § 2D1.1(c)(9), (11), (12).   The USPO recommended the imposition of a two-level enhancement for obstruction of justice and the denial of acceptance of responsibility and it determined a criminal history category II.  Applying these calculations to arrive at a guideline range of sentence, the admitted drug quantity would result in an offense level of 18 and a guideline range of 30-37 months, the inclusion of the future sale would result in an offense level of 20 and a range of 37-46 months, and the further inclusion of daily sales would result in an offense level of 24 and a range of 57-71 months.

---

[2] The PSR rounded up the figure for the daily sales from 106.35 to 106.40.  It also contained a non-consequential mathematical error, adding as follows:  85.05 + 113.40 + 106.40 = 304.80.  The sum of those numbers is actually 304.85.  However, 304.80 would be correct figure if the 106.35 figure had not been rounded up.

These calculations differ more markedly if the obstruction of justice enhancement under U.S.S.G. § 3C1.1 is not applied, since the obstruction of justice enhancement not only increases the total offense level by two levels, but also forms the basis for the USPO's recommendation against acceptance under U.S.S.G. § 3E1.1 and a reduction of three levels. Thus, depending on the application of the obstruction enhancement, the numerical swing in the offense level is five.[3]

Combining the obstruction of justice enhancement with the calculations concerning drug quantity, the impact of the USPO's recommendations becomes even more pronounced. If obstruction is not applied and acceptance is, the admitted drug quantity would result in a total offense level of 13 and a guideline range of 15-21 months; the inclusion of the future sale would result in a total offense level of 15 and a range of 21-27 months; and the further inclusion of the past daily sales would result in a total offense level of 19 and a range of 33-41 months. Depending on all these factors, therefore, Mr. Belskis could be facing a guideline sentence as low as 15 and as high as 71 months.

Mr. Belskis attacks the PSR on two grounds: one legal and the other factual. He claims that if the Court enhances his sentence by including drug quantities for future and past daily sales and for obstruction of justice, it would violate the Sixth Amendment by making factual findings that increase his sentence without granting him the right to trial by jury on those facts. Failing that argument, he asserts that the evidence does not support the USPO's recommendations on drug quantity and obstruction of justice.

## II.  DISCUSSION

### A. *Cunningham v. California*

---

[3] U.S.S.G. § 3C1.1 provides for a two-level increase for obstruction of justice; U.S.S.G. § 3E1.1 provides for a three-level reduction (at this level) for acceptance of responsibility, assuming the Government moved for the third point under U.S.S.G. § 3E1.1(b).

Mr. Belskis argues that *Cunningham v. California*, __U.S.__, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007) "rejected the notion of judicial fact finding." *Def.'s Sentencing Objection* at 3 (Docket # 33). Since Mr. Belskis neither admitted the drug amounts included as relevant conduct nor the facts underlying the obstruction of justice enhancement, he contends that the Sixth Amendment requires a jury, not a court, make these factual findings. He is incorrect. The Supreme Court resolved Mr. Belskis's contention in *United States v. Booker*, 543 U.S. 220 (2005), when it made the Sentencing Guidelines advisory. Following *Booker*, the First Circuit upheld judicial fact-finding for determining the advisory guideline sentencing ranges both in determining drug quantity and in applying obstruction of justice enhancements. *See United States v. Vazquez-Rivera*, 470 F.3d 443, 446-47 (1st Cir. 2006) (concerning judicial fact-finding of drug quantity);[4] *United States v. Gobbi*, 471 F.3d 302, 314 (1st Cir. 2006) (concerning judicial fact-finding to apply obstruction of justice enhancement).[5]

Although these First Circuit decisions pre-date *Cunningham*, the majority in *Cunningham* stated flatly that "California's [determinate sentencing law] does not resemble the advisory system the *Booker* Court had in view." *Cunningham*, 166 L. Ed. 2d at 875. The First Circuit has not addressed whether *Cunningham* changes whether a sentencing judge may engage in fact-finding to determine the guideline sentence; however, it is virtually inconceivable that it does. Post-*Cunningham*, the question remains whether Mr. Belskis faces a sentence "within the statutory maximum for his offenses." *United States v. Williams*, No. 06-712-cr, 2007 U.S. App. LEXIS 2551, at *4 (2d Cir. Feb. 2, 2007); *see also United States v. Pickett*, No. 05-3179, 2007 U.S. App. LEXIS 3272, at *11 (D.C. Cir. Feb. 13, 2007). Here, the statutory maximum

---

[4] In *Vazquez-Rivera*, the First Circuit states: "The judge may determine the drug quantity by a preponderance of the evidence." 470 F.3d at 446.

[5] In *Gobbi*, the First Circuit wrote: "Post-*Booker*, it remains the province of the sentencing court to determine by a preponderance of the evidence whether a factual basis for a finding of perjury (and, thus, for an obstruction of justice enhancement) exists." 471 F.3d at 314.

applicable to Mr. Belskis's violation of 21 U.S.C. § 841(a)(1) is found in § 841(b)(1)(C), which provides for a "term of imprisonment of not more than 20 years . . . ." 21 U.S.C. § 841(b)(1)(C). Mr. Belskis's uppermost advisory guideline ranges fall safely under the statutory maximum and, therefore, so long as he is sentenced below the statutory maximum, there is no Sixth Amendment violation.

### B. Drug Quantity: Future Sale

The PSR includes a future cocaine sale in its computation of drug quantity. It notes that during the June 29, 2006 transaction, in which a DEA undercover agent purchased two ounces of cocaine for $2,800.00, Mr. Belskis agreed to sell the agent four ounces of cocaine in two weeks. The USPO included this amount in its calculation of drug quantity as relevant conduct. As Mr. Belskis had not admitted the facts underlying this future transaction, on February 2, 2007, the Court held an evidentiary hearing to determine whether the USPO's calculations were accurate.

### 1. The Evidence

The evidence consisted of the testimony of an undercover DEA agent, a Confidential Informant (CI), Maine State Probation Officer Downs, Marjory Clark, Mr. Belskis's mother, and Dean Watson, Mr. Belskis's friend. The Agent testified that the CI arranged a meeting with Mr. Belskis and, after a couple of contacts, he purchased one ounce of cocaine from him on June 14, 2006 for $1,600.00. Tapes of their conversation reveal that Mr. Belskis informed the agent that if he started buying four ounces at a time, the price per ounce would go down to $1,250.00. The DEA could not come up with the $5,000.00 to purchase four ounces; instead, he purchased two ounces on June 29, 2006 for $1,400.00 per ounce or $2,800.00.[6]

---

[6] The Court is perplexed. The Government argued during sentencing that cocaine dealing in Rumford, Maine is rife and intractable, hence the dedication of substantial governmental resources to root it out. In the memorable words of the Assistant United States Attorney, you "cannot swing a stick in Rumford without hitting a cocaine dealer." Here, the Government used a confidential informant and a DEA Agent acting undercover to engage in a highly risky

During this transaction, the agent brought up the possibility of purchasing six ounces of cocaine. Mr. Belskis replied that he was not sure if he could get six ounces, but could get four. Following this agreement, because the DEA did not have, or could not authorize the $5,000.00, the agent became scarce. Mr. Belskis, however, remained interested in completing the sale and he repeatedly telephoned the CI to learn how he could reach the agent. He contacted her between ten and fifteen times between the end of June and sometime in August, when the CI gave him the agent's cell phone number. After that, Mr. Belskis stopped calling the CI.

On September 6, 2006, at about 11:30 p.m., the CI was awakened from sleep by a telephone call. She recognized the voice as Mr. Belskis's. He told her that he had learned she was a DEA agent and that the agent was a DEA agent as well and he threatened that they were all going "to get it." Although the CI denied the allegations, the conversation put a halt to the investigation and, on September 8, 2006, Mr. Belskis was arrested. The transaction for four ounces of cocaine at $1,250.00 per ounce was never completed.

### 2. *United States v. Estrada-Molina*

In *United States v. Estrada-Molina*, 931 F.2d 964 (1st Cir. 1991), the First Circuit discussed how the trial court should approach an unconsummated sale of drugs for guideline purposes. *See also United States v. Muniz*, 49 F.3d 36, 40-43 (1st Cir. 1995); *United States v. Bradley*, 917 F.2d 601, 604-06 (1st Cir. 1990). *Estrada-Molina* concluded that the drug quantity for a future sale could be included as relevant conduct even though, in that case, the future sale had been included as a count in the indictment and later dismissed. *Estrada-Molina* noted "that

---

investigation and, after selling one and then two ounces, the Defendant agreed to sell four ounces for $5,000.00. The Government, however, was unable to extend authority to spend $5,000.00 to make the buy. As a consequence, the DEA Agent had to go to ground and after weeks went by, the investigation unraveled and had to be terminated. The Government has now expended substantially more than $5,000.00 to hold evidentiary hearings, prepare memoranda, argue, and obtain a ruling on whether, if they had come up with $5,000.00, the Defendant would actually have made the sale. It seems patent that it would have been much better to have had access to the $5,000.00; if so, whether the Defendant would have made the sale would be a fact, not an argument.

there is no question that the district court properly concluded that a quantity of drugs involved in a dismissed count should be included in calculating the sentence provided that the activities involved 'the same course of conduct or common scheme or plan.'" *Id.* at 965 (citing U.S.S.G. § 1B1.3(a)(2)).

The First Circuit then addressed the evidentiary threshold for a district court's determination that the future sale should be included as relevant conduct. *Estrada-Molina* observed that "negotiated but undelivered drugs should be excluded from the sentencing calculus if the court finds that the defendant neither intended to produce nor was capable of producing the disputed amount." *Id.* at 966. On the other hand, the sentencing court should include these amounts if it concludes that it is more likely than not the defendant "intended to produce and was reasonably capable of producing the additional [drugs]." *Id. Estrada-Molina* is consistent with the Sentencing Guidelines, which provides the example of a consummated sale of 30 grams of cocaine and an attempted sale of 15 grams of cocaine and concludes that "subsection (a)(2) applies and the total amount of cocaine (45 grams) involved is used to determine the offense level." U.S.S.G. § 1B1.3, *App. Note* 3.

### 3. Conclusion – Future Sale

Here, the Court finds that Mr. Belskis "intended to produce and was reasonably capable of producing the additional" four ounces of cocaine and, therefore, this additional drug quantity is properly included in calculating the drug quantity for which he is responsible. First, Mr. Belskis is an admitted drug dealer; he acknowledged that he sold cocaine to the DEA agent on two occasions. The future sale would have involved the Defendant and the same DEA agent to whom he had previously sold a total of three ounces of cocaine. Second, Mr. Belskis demonstrated that he had access to cocaine; the future sale would have involved the same illegal

7

drug he had previously sold. Third, the $1,250.000 per ounce price for four ounces was consistent with the "volume discount" that Mr. Belskis had previously given for the agent's purchase of two ounces ($1,400.00 per ounce for two ounces as opposed to $1,600 per ounce for one ounce). Fourth, between late June and sometime in August, Mr. Belskis pestered the CI to learn the whereabouts of the agent in order to consummate the sale. Finally, the Court needs only hold Mr. Belskis to his own words. On June 14, 2006, Mr. Belskis was recorded saying: "If you start buying 4 at a time, I can get for $1250 a piece, 5 grand." He went on: "Well no, I'm just saying, I can get a ¼ pound for 5 fucking thousand flat, but that's $1250 max, I don't make a fucking thing." *Gov't Ex.* 1T at 9. The Court easily concludes that it is more likely than not that Mr. Belskis intended to produce and was reasonably capable of producing four ounces of cocaine for $5,000.00; the only obstacle to the sale turned out to be the DEA, not Mr. Belskis.

### C. Drug Quantity: Past Daily Sales

The PSR states that Mr. Belskis told the DEA agent that he was selling a quarter ounce of cocaine per day for another supplier and it includes the amount sold for the fifteen-day period between June 14, 2006 and June 29, 2006 in calculating drug quantity. This recommendation was also a subject of the evidentiary hearing.

#### 1. The Evidence

The evidence on this issue is fairly cryptic. At one point, Mr. Belskis told the agent that he was selling cocaine not just for the person from whom he had obtained the agent's cocaine, but also from another supplier. He said that he was selling a quarter ounce per day for this other supplier, a woman.[7]   On cross-examination, the agent acknowledged that drug dealers

---

[7] During one of the first telephone calls between the CI and Mr. Belskis in late May or early June 2006, Mr. Belskis said that he needed some notice before he could come up with the cocaine. He commented that he had "two places I can go, if not, I can drive to (inaudible), either way." *Gov't Ex.* 5T at 8. On June 28, 2006, Mr. Belskis was

occasionally puff up other deals to enhance their own importance, but he added that he had no reason to believe Mr. Belskis was not being truthful. When she was asked about Mr. Belskis having another supplier, the CI testified that Mr. Belskis had never told her about this female supplier.

### 2.  Conclusion – Past Daily Sales

Under U.S.S.G. § 1B1.3(a)(2), other drug sales will be included in a defendant's calculations, if they were "part of the same course of conduct or common scheme or plan as the offense of conviction." Although the Guidelines make it clear that the court may consider relevant conduct even though the defendant has neither been charged nor convicted of it, this is a closer question. The agent testified that Mr. Belskis himself admitted that he was selling one-quarter ounce of cocaine per day for another supplier, a female. The USPO logically seeks to take him at his word and it assigns one-quarter ounce of cocaine for a fifteen-day period to him, resulting in an additional drug quantity of 106.35 grams. Without this additional amount, Mr. Belskis would be held responsible for 198.45 grams of cocaine and the base offense level would be 18. With this additional amount, Mr. Belskis is responsible for 304.80 grams, barely tipping over the 300 gram threshold for base offense level 22. *See* U.S.S.G. § 2D1.1(c)(9), (11).

The circumstances of Mr. Belskis's admissions convince the Court it is more likely than not that at the same time he was selling the cocaine to the DEA agent, he was selling some cocaine to other customers for another supplier and that he actually sold as much as one-quarter ounce of cocaine per day. However, the Court cannot conclude that he sold a quarter ounce of cocaine each day for the fifteen day period in the PSR. This assumes a regularity of business practice that the Court is unwilling to impute to Mr. Belskis's cocaine dealing. If Mr. Belskis

---

recorded as saying: "I know I'm working for him, but most of the work is a quarter ounce a day for this other girl." *Gov't Ex.* 2T at 4.

missed only one day of sales during this time period or if the amounts each time were slightly less than a quarter of an ounce, his offense level would be reduced from 22 to 20. On the other hand, the Court readily concludes that in late June 2006, Mr. Belskis was selling cocaine from more than one supplier and that it is more likely than not that he had sold at least one additional quarter ounce of cocaine during this interval. If he sold a quarter of an ounce once during this time period, his offense level would increase from 18 to 20.[8] The evidence does not support the mathematical certainty necessary to place Mr. Belskis in the 300-plus grams category, but it amply supports the 200-plus grams category.

The Court finds it is more likely than not that, in June 2006, during the same interval that he sold cocaine to the DEA agent, Mr. Belskis also sold at least one quarter of an ounce to another customer for one of his suppliers and, therefore, the total drug quantity for which Mr. Belskis is responsible is more than 200 grams, but less than 300 grams of cocaine, for offense level 20.

### D. Obstruction of Justice and Acceptance of Responsibility

The PSR recommends that Mr. Belskis receive a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 and that he not receive a three-level reduction for acceptance under U.S.S.G. § 3E.1.1. The basis for its recommendations is that Mr. Belskis threatened the CI and the DEA agent. The evidentiary hearing addressed both the enhancement and the reduction.

---

[8] The PSR calculates a quarter ounce of cocaine to equal 7.09 grams. The combination of his actual sales and his future sale would be 85.05 grams (actual) plus 113.40 grams (future) for a total of 198.45 grams and the combination of his actual sales, his future sale, and his daily sales would be 304.80. If one sale of a quarter of an ounce is added to 198.45, the resulting total would increase the offense level from 18 to 20 – at least 200 grams – but if one sale of a quarter of an ounce is subtracted from 304.80, the resulting total would decrease the offense level from 22 to 20 – less than 300 grams.

### 1.  The Evidence

The CI testified that on September 6, 2006, at about 11:30 p.m., she received a telephone call from Mr. Belskis and that during the call, he accused her and the agent of being DEA agents and told her:  "You are a DEA agent" and "[The agent] is a DEA agent."  He said "You are all going to fucking get it."  The CI had been asleep, but this accusation and threat quickly got her attention; she protested that she did not know what Mr. Belskis was talking about and that what he was saying was a lie.  Although she had the ability to record the conversation, she did not because she had been awakened from sleep and the entire conversation took only about 1 ½ minutes.  The morning after the call, she felt intimidated and she was about to call the agent, when the agent called her.    The threat scuttled the investigation and the CI was paid to relocate.

On cross-examination, defense counsel closely questioned the CI about whether she had gone to get cocaine from Mr. Belskis earlier on September 6, 2006, and whether he had turned her down.  The implication was that she was making up the threatening telephone call because she was angry that Mr. Belskis would not sell her cocaine on September 6.  Further, if the CI had sought cocaine from Mr. Belskis on September 6, 2006, and was now denying it under oath, the contradiction would affect her credibility.  In response, the CI denied that she had sought cocaine from Mr. Belskis on September 6, 2006, recalling that she had been in Rockland, Maine, a long distance from Rumford.  She specifically recalled where she was on September 6, 2006, because her daughter was having a sonogram in Rockland and she was there with her.  She insisted she did not return to Rumford until about 9:30 p.m.

The Government also produced the testimony of State Probation Officer Michael Downs, who testified that he had supervised Mr. Belskis from May 2001 to December 2001, when he was on state probation for a drug offense.  During his probation, Mr. Belskis became upset with

Officer Downs, came to the Police Department in Rumford, Maine, and said that Officer Downs was "lucky he was not murdered." He returned the next day and repeated his statement, expanding it to include not only Officer Downs, but also a person named Richard Goldman. Officer Downs arrested Mr. Belskis and after his arrest, a search of his person revealed letters that Mr. Belskis had written to Judge McElwee, a state district judge, accusing everyone of working against him, lambasting Officer Downs for abusing his authority, and threatening to assault and to commit arson against Officer Downs. The officer testified that as a result of these threats, Mr. Belskis was terminated from Drug Court. Officer Downs also testified that he was the CI's Probation Officer from May 2006 to September 2006 and, during that interval, she had neither violated probation nor tested positive for illegal drugs.

To rebut the testimony of the CI, Mr. Belskis produced Marjory Clark, Mr. Belskis's mother, who testified that Mr. Belskis was living with her in September 2006 and that he did not have a driver's license. She said that she had given him a ride to his friend Dino's house a couple of days before he was arrested, on September 6, 2006, and that, at about 7:30 that evening, the CI arrived at her home, anxiously asking for her son. Ms. Clark became irate with the CI, swore at her, and ordered her off her property. On cross-examination, however, she admitted that this episode could have taken place three days before her son was arrested, on September 5, 2006. She further testified that it was not uncommon for people to come to her home looking for her son – perhaps two or three people per night – and when they did, they never stayed long.

Ms. Clark was recalled to testify on February 23, 2007. To corroborate her earlier testimony, she produced her personal calendar; for the date September 6, 2006, she had written "Took Joe to Dean." *Gov't Ex.* 6. On cross-examination, she admitted that she had not written

12

this note in her calendar on September 6, 2006.  Although she was vague as to the exact time, she testified that she had written the note after speaking with her son sometime after his arrest.  She admitted that she had taken her son to Dino's as many as 70 times during the year 2006, but that this was the only time she had made a note of doing so on her calendar.

Dean "Dino" Watson, a close friend of Mr. Belskis, testified for him.  Mr. Watson said that two or three days before Mr. Belskis was arrested, Mr. Belskis came to his house at about 4:00 or 5:00 p.m.  He also claimed that the CI had dropped by his house with her boyfriend and was looking to buy drugs from Mr. Belskis, but that Mr. Belskis refused to sell her any and told her to leave.  Mr. Watson left Mr. Belskis alone that night and could not say whether Mr. Belskis had made a late night call to the CI.

## 2.  The Sentencing Guidelines

The Guidelines impose a two-level enhancement if "(A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation . . . of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct . . . ." U.S.S.G. § 3C1.1.  The Application Note includes "threatening, intimidating . . . a . . . witness . . . or attempting to do so" as examples of obstructive conduct.  The First Circuit has upheld the imposition of the two-level enhancement for remarks that could reasonably be interpreted as a threat.  *See United States v. Fraza*, 106 F.3d 1050, 1055 (1st Cir. 1997) (holding that witness intimidation along with other acts can constitute obstruction of justice); *United States v. Lagasse*, 87 F.3d 18 (1st Cir. 1996) (applying an obstruction of justice enhancement to the defendant's assault upon another prisoner he characterized as a "rat"); *United States v. Sabatino*, 943 F.2d 94, 100-01 (1st Cir. 1991) (telling a witness she would "end up taking a one-way walk through

13

the woods" was a proper basis for an obstruction enhancement).  To apply the obstruction of justice enhancement, the defendant's actions must be related to the offense of conviction.  *United States v. McMinn*, 103 F.3d 216, 218-19 (1st Cir. 1997).

The Guidelines provide that "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.  There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply."  U.S.S.G. § 3E1.1, *App. Note* 4; *see United States v. Boos*, 329 F.3d 907, 912 (7th Cir. 2003) (stating that the defendant's attempted intimidation of a witness "doomed his chances for a 3-level reduction under U.S.S.G. § 3E1.1(b)").

### 3.  Conclusion

The Court readily concludes that Mr. Belskis is subject to the enhancement for obstruction of justice under U.S.S.G. § 3C1.1 and is not entitled to a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.  Having had the opportunity to evaluate the CI's credibility, the Court finds that she was truthful when she testified that Mr. Belskis called her late during the evening of September 6, 2006, accused her and the DEA agent of working for the Government, and threatened them.  The testimony of Ms. Clark and Mr. Watson is unconvincing.  The Court declines to find that the CI went to Dino Watson's residence to ask Mr. Belskis for cocaine, and it discounts Mr. Belskis's argument that the CI concocted the story of his threatening telephone call because she was angry with him for not selling her drugs.

It is inconceivable that, if the CI had gone to buy drugs from Mr. Belskis during the evening of September 6, 2006, Mr. Belskis would have simply declined to sell her drugs and let her drive off.  Mr. Belskis is an admitted cocaine dealer and the evidence amply establishes that

he was constantly vigilant and suspicious, plying his drugs under an enormous cloud of justifiable paranoia.  The evidence also establishes that Mr. Belskis made direct and violent threats in the past and Mr. Belskis was fully capable of threatening a CI or a DEA Agent. Furthermore, Dino Watson testified that it was "all over town" that the CI was "a snitch" and that he had learned about it about three days earlier.  With this accumulated evidence, the Court cannot begin to find that, if the very woman suspected of cooperating with police to put him in jail were to serendipitously arrive at his doorstep, Mr. Belskis would simply decline to sell her drugs and would not use this unanticipated opportunity to directly and forcefully confront her.

Equally incredible is the notion that the CI - aware of how to get drugs - would have gone to make an unauthorized buy from the one person in Rumford she was certain was under federal investigation.  This suggestion is also inconsistent with Probation Officer Downs's testimony that the CI had tested clean of illegal drug use during this same period.  Finally, it is undisputed that the DEA terminated its investigation of Mr. Belskis in early September 2006.  If nothing happened on September 6, 2006, it is difficult to imagine why the investigative team promptly discontinued the investigation and arrested Mr. Belskis on September 8, 2006.  The threat is consistent with the early termination of the investigation.

In short, the Court, without hesitation, finds that it is more likely than not that Mr. Belskis telephoned the CI at about 11:30 p.m. on September 6, 2006, and threatened to harm both the CI and the DEA Agent, resulting in Mr. Belskis's arrest and the termination of the Rumford investigation.

Finding that Mr. Belskis threatened both the CI and the DEA agent, the Court imposes a two-level enhancement under U.S.S.G. § 3C1.1; the Court further concludes that the Defendant has not demonstrated an "extraordinary case," whereby he should, despite his attempt at

15

obstruction of justice, be accorded a reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility.

## III.  CONCLUSION

The Court concludes that the quantity of cocaine for which Joseph Belskis is responsible is greater than 200 grams but less than 300 grams, and that his base offense level is 20.  The Court imposes a two-level increase under U.S.S.G. § 3C1.1 for obstruction of justice and declines to grant him a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.  With a total offense level of 22, and at criminal history category II, the Defendant faces an advisory Guideline sentencing range of 46 to 57 months.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of February, 2007